# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| STATE OF WASHINGTON, | No.  50664-5-II |
| Respondent, | PART PUBLISHED OPINION |
| v. | |
| DARIN R. VANCE, | |
| Appellant. | |

GLASGOW, J. — Based on information received from federal law enforcement, the

Vancouver Police Department and Clark County Sheriff's Office obtained and executed a search

warrant for the home of Darin Richard Vance to search for depictions of a minor engaged in

sexually explicit conduct.  Investigators found several such images and ultimately charged Vance

with 10 counts of possession of depictions of a minor engaged in sexually explicit conduct.

Following a bench trial, Vance was convicted on all 10 counts.  He appeals his convictions and

sentence.

Vance argues that the search warrant violated article I, section 7 of the Washington

Constitution.  He contends that the warrant was not sufficiently particular, relying on Division

One's decision in *State v. McKee*, 3 Wn. App. 2d 11, 413 P.3d 1049 (2018), *rev'd and

remanded*, 438 P.3d 528 (2019).[1]  We hold that the warrant in this case was different from the

---

[1] The issue before the Washington Supreme Court in *McKee* was whether the proper remedy
following suppression of cell phone evidence was to vacate the defendant's convictions and
remand to trial court for further proceedings, or to order all the counts dismissed.  438 P.3d at
530.  The court held that the Court of Appeals should have vacated and remanded, rather than
dismissing.  *Id.*  The Supreme Court did not address whether the warrant was sufficiently
particular.  *Id.*

one found invalid in *McKee* and was sufficiently particular to comply with the Fourth

Amendment and article I, section 7. We address Vance's remaining arguments in the

unpublished portion of this opinion.

We affirm Vance's convictions and sentence.

FACTS

On August 26, 2010, FBI Special Agent Alfred Burney, working undercover in Detroit,

Michigan, used a peer-to-peer file sharing program to download 35 files from a software user

with an IP address subscribed to Comcast. At least 20 of those files appeared to be pictures of

children engaged in sexually explicit activity. Burney then submitted an administrative

subpoena to Comcast requesting all subscriber information for the person using that IP address.

Comcast responded that the IP address belonged to Vance. Burney sent this information and the

downloaded files to the FBI's Seattle office.

The Seattle FBI office obtained and confirmed Vance's street address and sent the

information and files it received to Investigator Maggi Holbrook of the Vancouver Police

Department and the Clark County Sheriff's Office Digital Evidence Cybercrime Unit.

At the time of Burney's investigation, the FBI was part of an interagency, multi-

jurisdictional initiative involving the Department of Justice, the Department of Homeland

Security's United States Immigration and Customs Enforcement, and the Internet Crimes

Against Children task forces. The sheriff's office's Cybercrime Unit was a local Internet Crimes

Against Children task force, and Holbrook was the local liaison. Burney was not involved with

the task force himself.

No. 50664-5-II

Using the information received from the FBI, Detective Patrick Kennedy of the Vancouver Police Department and Special Agent Julie Peay of Immigration and Customs Enforcement independently verified Vance's home address. Kennedy then obtained a search warrant for Vance's home. The warrant first authorized a search for "evidence of the crime(s) of: RCW 9.68A.050 Dealing in depictions of a minor engaged in sexually explicit conduct and RCW 9.68A.070 Possession of depictions of a minor engaged in sexually explicit conduct." Clerk's Papers (CP) at 3. The warrant then described the items to be seized, including a list of specific types of electronic devices and media "capable of being used to commit or further the crimes outlined above, or to create, access, or store the types of evidence, contraband, fruits, or instrumentalities of such crimes." CP at 4.

The warrant also identified for seizure the accompanying records, documents, and information necessary to operate and access those devices and data. This description of the goods authorized for seizure concluded with authorization to transfer any and/or all seized items to the Cybercrime Unit:

> [F]or the examination, analysis, and recovery of data from any seized items to include: graphic/image files in common formats such as JPG, GIF, PNG or in any other data format in which they might be stored, pictures, movie[] files, emails, spreadsheets, databases, word processing documents, Internet history, Internet web pages, newsgroup information, passwords encrypted files, documents, software programs, or any other data files, whether in allocated or unallocated space on the media, whether fully or partially intact or deleted, *that are related to the production, creation, collection, trade, sale, distribution, or retention of files depicting minors engaged in sexually explicit acts/child pornography*.

CP at 6 (emphasis added).

The Cybercrime Unit executed the warrant on Vance's home and seized several electronic devices. The resulting forensic examination revealed at least 20 images and videos depicting minors engaged in sexually explicit conduct.

The State charged Vance with seven counts of first degree possession of depictions of a minor engaged in sexually explicit conduct and three counts of first degree dealing in depictions of a minor engaged in sexually explicit conduct. *See State v. Vance*, 184 Wn. App. 902, 906, 339 P.3d 245 (2014). The trial court redacted from the search warrant affidavit information obtained by federal agents, found probable cause for the search warrant no longer existed, granted the suppression motion, and dismissed the charges against Vance. *See id.* at 909-10. Vance then moved to suppress the evidence seized from his home and dismiss the case. *Id.* at 905. The trial court granted the motion. CP at 593. The State appealed and we reversed. *See id.* at 905-06.

On remand, Vance filed a new motion to suppress the evidence seized from his home arguing in part that the warrant was not sufficiently particular. The trial court denied the motion to suppress, and the parties proceeded to a bench trial. Just before trial, the State filed an amended information dismissing the distribution charges and instead charged Vance with a total of 10 counts of possession of depictions of minors engaged in explicit sexual conduct. After a bench trial, the court found Vance guilty on all 10 counts. Vance requested an exceptional sentence downward, but the court imposed a standard range sentence of 77 months of confinement.

Vance appeals his convictions and sentence.

ANALYSIS

PARTICULARITY OF SEARCH WARRANT

Vance argues that the search warrant for his electronic devices was insufficiently particular to satisfy the Fourth Amendment or article I, section 7, and so all evidence seized as a result of that warrant should have been suppressed. We disagree.

Both the Fourth Amendment and article I, section 7 require that a search warrant describe with particularity the place to be searched and the persons or things to be seized. *State v. Perrone*, 119 Wn.2d 538, 545, 834 P.2d 611 (1992). The particularity requirement prevents general and overbroad searches. *Id.* Where the warrant involves materials potentially protected by the First Amendment, a greater degree of particularity is required. *Id*. at 547. We review de novo whether a search warrant contains a sufficiently particularized description of the items to be searched and seized. *Id.* at 549.

A search warrant's description of the place to be searched and property to be seized is sufficiently particular if "it is as specific as the circumstances and the nature of the activity under investigation permit." *Id.* at 547. A generic or general description of the things to be seized may be sufficient if probable cause is shown and "a more specific description is impossible" with the information known to law enforcement at the time. *Id.* Search warrants must be "tested and interpreted in a common sense, practical manner, rather than in a hypertechnical sense." *Id.* at 549.

Vance relies on recent case law specifically addressing warrants authorizing searches for and seizures of evidence related to sexually explicit depictions of minors. He analogizes this case to *McKee*, 3 Wn. App. 2d 11.

The search warrant in *McKee* listed the alleged crimes as "Sexual Exploitation of a Minor RCW 9.68A.040," "Dealing in depictions of minor engaged in sexually explicit conduct RCW 9.68A.050." *Id.* at 18. The warrant authorized the police to conduct a "physical dump" of "all of the memory of the phone for examination." *Id.* at 29. The warrant then identified certain "Items Wanted" to be seized from the defendant's cell phone amounting essentially to any "electronic data from the cell phone showing evidence of the above listed crimes." *Id.* at 18-19.

In *McKee*, Division One of our court held that the warrant lacked the requisite particularity because it "was not carefully tailored to the justification to search and was not limited to data for which there was probable cause." *Id.* at 29. In other words, "the search warrant clearly allow[ed] search and seizure of data without regard to whether the data [was] connected to the crime." *Id.* "The language of the search warrant left to the discretion of the police what to seize." *Id.*

The *McKee* court relied on *State v. Besola*, in which our Supreme Court held that a mere citation to the child pornography statute at the top of the warrant did nothing to make it more particular. 184 Wn.2d 605, 615, 359 P.3d 799 (2015). The warrant in *Besola* identified the crime of "Possession of Child Pornography R.C.W. 9.68A.070," and authorized the police to seize:

> 1. Any and all video tapes, CDs, DVDs, or any other visual and or audio recordings;
>
> 2. Any and all printed pornographic materials;
>
> 3. Any photographs, but particularly of minors;
>
> 4. Any and all computer hard drives or laptop computers and any memory storage devices;

     5. Any and all documents demonstrating purchase, sale or transfer of
     pornographic material.

*Id.* at 608-09.  The warrant's rote citation to the statute failed to add information, such as the definition of "child pornography" that would have modified or limited the evidence that officers could seize.  *Id.* at 615.  Nor did the warrant include specific language using the citation to the statute "to describe the materials sought."  *Id.* at 614.  The omission of such limiting information created the "primary defect" in the warrant—it covered lawfully possessed materials, such as adult pornography and photographs of minors that did not depict them engaged in sexually explicit acts.  *Id.* at 616.

     The State argues this case more closely resembles *State v. Martinez*, 2 Wn. App. 2d 55, 408 P.3d 721, *review denied*, 190 Wn.2d 1028 (2018).  There, Division One upheld a warrant that authorized seizure of any "photographs, pictures, albums of photographs, books, newspapers, magazines and other writings on the subject of sexual activities involving children." *Id.* at 66.  The warrant also authorized the seizure of "pictures and/or drawings depicting children under the age of eighteen years who may be victims of the aforementioned offenses, and photographs and/or pictures depicting minors under the age of eighteen years engaged in sexually explicit conduct as defined in RCW 9.68A.011(3)."  *Id.* at 66.

     The *Martinez* court held the warrant was sufficiently particular because rather than merely cite to the statute, "it use[d] the language 'sexually explicit conduct as defined in RCW 9.68A.011(3).'"  *Id.* at 67.  The court also reasoned that, unlike in *Perrone* where the warrant contained the overbroad term "child pornography," the *Martinez* warrant used the statutory language "sexually explicit conduct."  *Id.* at 66.  Finally, while the warrant in *Martinez* also authorized the seizure of some materials that could be lawfully possessed, that alone did "not

automatically make the warrant overbroad." *Id.* at 67. "[P]ossession of materials about sexuality involving children [was] relevant to the charged offense." *Id.* The warrant was not overbroad for authorizing the seizure of relevant materials. *Id.* For these reasons, the court concluded the warrant provided law enforcement with an objective standard to determine what should be seized. *Id.*

We conclude that the warrant in this case is more analogous to the one upheld in *Martinez* than the warrants lacking particularity struck down in *McKee*, *Perrone*, and *Besola*. The warrant in this case explained that there was probable cause to search for "evidence of the crime(s) of: RCW 9.68.050 Dealing in depictions of a minor engaged in sexually explicit conduct and RCW 9.68A.070 Possession of depictions of a minor engaged in sexually explicit conduct." CP at 3. Then throughout, the warrant authorizes a search for computers or various devices "capable of being used to commit or further the crimes outlined above, or to create, access, or store the types of evidence, contraband, fruits, or instrumentalities of such crimes," connecting the search to depictions of minors engaged in sexually explicit conduct in a manner that was absent in *Besola*, 184 Wn.2d at 604. CP at 4.

Furthermore, the final paragraph of the warrant permits the Cybercrime Unit to transfer the electronic and related devices and to search them for "graphic/image files in common formats . . . pictures, movie[] files, emails, spreadsheets, databases, word processing documents, Internet history, . . . newsgroup information, . . . encrypted files" and other similar files "that are related to the production, creation, collection, trade, sale, distribution, or retention of files depicting minors engaged in sexually explicit acts/child pornography." CP at 5-6.

Unlike the warrants in *Besola* and *McKee*, the warrant here regularly referred back to the statutory language limiting the evidence that officers could seize and so was sufficiently particular to cover only data and items connected to the crime. Unlike the warrant in *McKee*, which merely identified the crime of "Sexual exploitation of a minor," or *Perrone*, which only used the overbroad term, "child pornography," here the warrant used the more specific language, "Possession of depictions of a minor engaged in sexually explicit conduct." *McKee*, 3 Wn. App. 2d at 18; *Perrone*, 119 Wn.2d at 553-54; CP at 134. The warrant here used sufficiently specific language to authorize the seizure of only illegal materials.

Vance argues that the warrant should have included the definition of "sexually explicit conduct" in RCW 9.68A.011(3). To be sure, adding a reference to that definition would have made this warrant even more precise. But the warrant taken as a whole makes it clear to the executing officer what specific items are authorized for search and seizure. And it does not appear that this warrant authorized law enforcement to search for and seize adult pornography or depictions of children more generally. While the warrant contemplates that law enforcement would retain Vance's devices for a period of time to search them for the files to seize, allowing law enforcement some amount of time to search electronic devices for this specifically identified evidence to seize does not undermine the validity of the warrant.

Accordingly, we hold that the search warrant was sufficiently particular. To the extent *McKee* contradicts our conclusion, we disagree with *McKee*. We affirm Vance's convictions and his sentence.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Vance also argues that the trial court erred in applying the silver platter doctrine, which allows admission of evidence that law enforcement officers of another jurisdiction validly obtained; the 2004 amendment to the special sex offender sentencing alternative (SSOSA) statute violated equal protection; the trial court erred by refusing to impose an exceptional sentence downward; and his sentence constituted cruel punishment under article I, section 14 of the Washington Constitution. We disagree.

## I. SILVER PLATTER DOCTRINE

Vance argues that the trial court improperly applied the silver platter doctrine in denying his motion to suppress. We disagree.

In reviewing a trial court's ruling on a motion to suppress, we determine whether substantial evidence supports the challenged findings of fact and whether the findings support the trial court's conclusions of law. *State v. Garvin*, 166 Wn.2d 242, 249, 207 P.3d 1266 (2009). We review the trial court's conclusions of law de novo. *Id.*

A.      Scope of the Silver Platter Doctrine

The silver platter doctrine allows evidence that was lawfully obtained under the laws of another jurisdiction to be admitted in Washington courts, even if the discovery of that evidence would have violated Washington law. *State v. Mezquia*, 129 Wn. App. 118, 132, 118 P.3d 378 (2005). The doctrine has limitations, however, in order to prevent the government from using more lenient rules in other jurisdictions to circumvent the limitations of Washington law. *See id.*

at 133. Evidence is admissible under this doctrine when (1) the foreign jurisdiction lawfully obtained evidence, and (2) the forum state's officers did not act as agents or cooperate with or assist the foreign jurisdiction, or vice versa. *Id.* at 133 "'[A]ntecedent mutual planning, joint operations, cooperative investigations, or mutual assistance between federal and state officers may sufficiently establish agency and serve to bring the conduct of the federal agents under the color of state law.'" *State v. Brown*, 132 Wn.2d 529, 587, 940 P.2d 546 (1997) (quoting *State v. Gwinner*, 59 Wn. App. 119, 125, 796 P.2d 728 (1990)). "'On the other hand, mere contact, awareness of ongoing investigations or the exchange of information may not transmute the relationship into one of agency.'" *Id.* (quoting *Gwinner*, 59 Wn. App. at 125).

For example, we have held that there existed an inappropriate level of cooperation where Washington officers accompanied DEA agents to the defendant's property, took aerial photographs at the DEA's request, and turned those photographs over to the DEA. *State v. Johnson*, 75 Wn. App. 692, 700-01, 879 P.2d 984 (1994). On the other hand, "[w]here the officials of the foreign jurisdiction gathered evidence independently and then contacted Washington police officers, our courts have concluded there [was] not an inappropriate level of cooperation." *Mezquia*, 129 Wn. App. at 133. Even where Washington law enforcement alerted federal agents to possible illegal activity without directing federal agents on how to proceed, that was not enough to make the federal officers agents of the State. *See Gwinner*, 59 Wn. App. at 125-26.

B.      Constitutionality of the Silver Platter Doctrine

Vance first asks us to reject the silver platter doctrine altogether, asserting that Washington's continued application of the doctrine violates article I, section 7 of the Washington

Constitution. Vance argues that we should follow the United States Supreme Court's holding in *Elkins v. United States*, 364 U.S. 206, 223, 80 S. Ct. 1437, 4 L. Ed. 2d 1669 (1960) ("[E]vidence obtained by state officers during a search which, if conducted by federal officers, would have violated the defendant's immunity from unreasonable searches and seizures under the Fourth Amendment is inadmissible over the defendant's timely objection in a federal criminal trial.").

However, Washington courts, including our Supreme Court, have consistently applied the silver platter doctrine with respect to evidence obtained from foreign jurisdictions. *See, e.g.*, *Brown*, 132 Wn.2d 529; *Gwinner*, 59 Wn. App. 119; *Johnson*, 75 Wn. App. 692. Washington courts have reasoned that under federalism principles, state constitutions do not dictate federal action and no legitimate state interests would be furthered by forbidding transfer of criminal evidence from federal to state authorities when the evidence was lawfully obtained by federal agents. *Brown*, 132 Wn.2d at 586-87. We follow our state's precedent and apply the silver platter doctrine to the facts of this case.

C.      Application of the Silver Platter Doctrine

Vance asserts that Washington officers would have had to obtain-a search warrant rather than use administrative subpoena power to initially discover that Vance had downloaded child pornography. Even so, Vance does not argue that the evidence in question was obtained in violation of federal law. Thus, Vance does not dispute that the first prong of the silver platter doctrine, whether the evidence was obtained lawfully under the agent's foreign jurisdiction, was met. We accordingly need only consider the second prong of the silver platter doctrine: whether there was inappropriate cooperation between state and federal authorities.

12

Vance argues the involvement of federal authorities in this case violated the silver platter doctrine because of the ongoing high level of interagency cooperation between those entities and the Cybercrime Unit in investigating and prosecuting child pornography cases generally. He reasons that because the unit works as part of an interconnected network of federal, state, and local law enforcement agencies, federal officers are essentially operating as agents of the State during these investigations rather than conducting separate and independent federal investigations. According to Vance, the actions of federal officers in this case amounted to antecedent planning, joint operations, or other cooperative investigation by virtue of these federal and state agencies' established and continuing practice of working together to investigate child pornography crimes. *See Brown*, 132 Wn.2d at 587.

Vance argues that an agency relationship exists here because of the very makeup of the Cybercrime Unit. First, he claims Holbrook was working as a federal agent when reviewing the case because she first referred the case to the United States Attorney's Office for prosecution and only referred it to state authorities after the United States Attorney's Office rejected the case. Second, he claims Holbrook and the Cybercrime Unit have a formal agency relationship with federal law enforcement because of the unit's position as the local task force and its ongoing relationship with federal agents. He points to admissions by federal officers that this case was "based on a collaborative investigation conducted by the federal agents . . . and state and local law enforcement." Br. of Appellant at 24; CP at 8. He contends that federal agents often work in conjunction with Cybercrime Unit agents on joint state-federal investigations, pointing specifically to the fact that federal agents, unlike state authorities, have the power of administrative subpoenas. We disagree.

The facts of this case are similar to *Mezquia*, where Division One of this court concluded there was no inappropriate cooperation between state and foreign officers. 129 Wn. App. at 134. In *Mezquia*, although Washington and Florida authorities both participated in the same national DNA database, there was no inappropriate cooperation between them on Mezquia's case because the Florida officials had independently gathered DNA evidence before contacting Washington police officers. *Id*. at 133-34.

Here, the Cybercrime Unit and FBI both participate in the same nationwide networks to combat child pornography, but the only contact between the unit and FBI officials in the investigation of Vance occurred when the Seattle FBI office sent to Holbrook the information that Burney had obtained. There is nothing in the record to suggest that Washington officers in any way directed, assisted, or participated in Burney's investigation, or that the FBI was involved with the ensuing investigation carried out by the Cybercrime Unit. Burney independently conducted his undercover peer-to-peer sessions in Detroit without any awareness of or involvement from Washington law enforcement. Upon receiving the FBI's information, the Cybercrime Unit effectively took over the case with no further involvement from the FBI.

Although Kennedy stated that his affidavit was based on a collaborative investigation by federal agents and state and local law enforcement, this seems to refer merely to the fact that the FBI shared information with the Cybercrime Unit. Vance has pointed to no evidence in the record that FBI and Cybercrime Unit officials worked together to investigate Vance beyond the one instance of information sharing. And although Vance alleges that Holbrook referred the case to the United States Attorney's Office before ultimately referring it to state authorities, he has

pointed to nothing in the record that supports this assertion. Moreover, a referral to the United States Attorney, without more, would not create an agency relationship.

There is no evidence of antecedent mutual planning, joint operations, cooperative investigation, or mutual assistance between federal and state officers beyond one instance of information sharing. The record shows that the FBI validly uncovered information under federal law and merely shared that information with local law enforcement, who then took over the investigation. *See Mezquia*, 129 Wn. App. at 133 ("[w]here the officials of the foreign jurisdiction gathered evidence independently and then contacted Washington police officers, our courts have concluded there is not an inappropriate level of cooperation."); *Brown*, 132 Wn.2d at 587 ("'[M]ere contact, awareness of ongoing investigations or the exchange of information may not transmute the relationship into one of agency.'") (quoting *Gwinner*, 59 Wn. App. at 125).

We conclude that, under the specific facts of this case, there was no agency relationship that would run afoul of the silver platter doctrine. We recognize there may be circumstances where a state or local agency's ongoing involvement in a nationwide task force could create an agency relationship. However, Vance has not shown that the task force involvement here created undue cooperation in the investigation of his case.

In sum, we hold the trial court properly applied the silver platter doctrine and denied Vance's motion to suppress on this ground.

## II. EQUAL PROTECTION CHALLENGE TO SSOSA ELIGIBILITY

At sentencing, Vance requested a SSOSA sentence under RCW 9.94A.670, as well as an exceptional sentence downward on the grounds that the standard range was clearly excessive. The court considered Vance's arguments, but ultimately decided to sentence him within the

standard sentence range of 77-102 months. The court then sentenced him to 77 months of confinement and 36 months of community custody.

In 2004, the legislature amended the SSOSA eligibility statute to add an additional requirement that the defendant have an "established relationship with, or connection to, the victim such that the sole connection with the victim was not the commission of the crime." RCW 9.94A.670(2)(e); LAWS OF 2004, ch. 176, § 4(2)(e). Because Vance did not have an established relationship with the victims, he is not eligible for SSOSA under the 2004 amendment. *State v. Willhoite*, 165 Wn. App. 911, 915, 268 P.3d 994 (2012).

Vance argues that the 2004 amendment violates the equal protection clauses of the state and federal constitutions because it lacks any rational basis for distinguishing between offenders who had established relationships with their victims and those who did not.[2] We disagree.[3]

Vance is not a member of a suspect class and this challenge does not implicate a fundamental right, so rational basis review applies. *State v. Harner*, 153 Wn.2d 228, 235-36, 103 P.3d 738 (2004). Vance has the burden of "showing that the law is irrelevant to maintaining a state objective or that it creates an arbitrary classification." *State v. Simmons*, 152 Wn.2d 450, 458, 98 P.3d 789 (2004). A legislative classification will satisfy rational basis review if "'there is any reasonably conceivable state of facts that could provide a rational basis for the

---

[2] Vance also asserts a privileges and immunities challenge. We consider the equal protection clause and the privileges and immunities clause under the same analysis in this context. *See State v. Shawn P.*, 122 Wn.2d 553, 559-60, 859 P.2d 1220 (1993).

[3] Vance also contends that the trial court refused to consider his equal protection challenge to the 2004 SSOSA amendment, and asks us to remand to the trial court to consider his argument. We conclude that the trial court addressed the constitutionality of the statute sufficiently for us to resolve this issue on the merits.

classification.'" *Heller v. Doe by Doe*, 509 U.S. 312, 320, 113 S. Ct. 2637, 125 L. Ed. 2d 257 (1993) (quoting *FCC v. Beach Commc'ns Inc.*, 508 U.S. 307, 313, 113 S. Ct. 2096, 124 L. Ed. 2d 257 (1993)); *see also Harris v. Charles*, 171 Wn.2d 455, 466, 256 P.3d 328 (2011).

Vance argues his exclusion from SSOSA violates equal protection because the legislature did not set forth any legitimate governmental objective for excluding sex offenders with no established relationship to the victim from SSOSA eligibility.

The State analogizes this case to *State v. McNeair*, in which Division One rejected an equal protection claim by a defendant who was ineligible for the drug offender sentencing alternative due to statutory requirements that certain offenders not have prior felony convictions. 88 Wn. App. 331, 944 P.2d 1099 (1997). The court reasoned that the legislature made a rational classification "in light of the goal of maximizing the potential for successful rehabilitation of those drug offenders to which the statute applies." *Id.* at 341.

We agree with the State. Similar to *McNeair*, here it appears the legislature's goal was to encourage reporting where the offender had a preexisting relationship with their victim. H.B. REP. ON HB 2400 at 5, 58th LEG., REG. SESS. (Wash. 2004). The legislature has accomplished this by providing an alternative sentencing scheme that emphasizes treatment over incarceration, making the consequences of victim reporting potentially less drastic.

These objectives provide a rational basis for a scheme that excludes other classes of offenders from the alternative sentencing arrangements offered by SSOSA. While Vance argues that there is no reason to treat his offense more severely than those eligible for SSOSA under the statute, that is not enough to defeat rational basis review where any conceivable legislative rationale will suffice. Like the statute in *McNeair*, the SSOSA provision here implies that the

No. 50664-5-II

legislature "balanced competing objectives" and made a conceivably legitimate choice to exclude sex offenders with no established relationship to their victims from the sentencing alternative. *McNeair*, 88 Wn. App. at 342.

We accordingly reject Vance's constitutional challenge to the 2004 amendment and affirm the trial court's decision not to consider a SSOSA sentence.

### III. REQUEST FOR EXCEPTIONAL SENTENCE DOWNWARD

Vance argues the trial court abused its discretion in not imposing an exceptional sentence downward based on RCW 9.94A.535(1), the multiple offense policy of RCW 9.94A.589, and the purposes of the Sentencing Reform Act of 1981 (SRA), chapter 9.94A RCW and RCW 9.94A.010. We disagree.

A defendant generally cannot appeal the length of a sentence within the standard sentence range imposed under RCW 9.94A.510 or RCW 9.94A.517. RCW 9.94A.585(1). A discretionary sentence within the standard range is reviewable in circumstances where the court refused to exercise its discretion at all or relied on an impermissible basis for refusing to impose an exceptional sentence below the standard range. *State v. McFarland*, 189 Wn.2d 47, 56, 399 P.3d 1106 (2017).

> A trial court errs when "it refuses categorically to impose an exceptional sentence below the standard range under any circumstances" or when it operates under the "mistaken belief that it did not have the discretion to impose a mitigated exceptional sentence for which [a defendant] may have been eligible."

*Id*. (quoting *State v. Garcia-Martinez*, 88 Wn. App. 322, 330, 944 P.2d 1104 (1997)). Put simply, "a trial court that has considered the facts and has concluded that there is no basis for an exceptional sentence has exercised its discretion." *Garcia-Martinez*, 88 Wn. App. at 330.

18

Under RCW 9.94.535, a sentencing court may impose an exceptional sentence below the standard range if it finds there are substantial and compelling reasons justifying one. RCW 9.94A.535(1) contains a nonexclusive list of mitigating factors that support an exceptional sentence downward, including when the "operation of the multiple offense policy of RCW 9.94A.589 results in a presumptive sentence that is clearly excessive in light of the purpose of [the SRA], as expressed in RCW 9.94A.010." RCW 9.94A.535(1)(g); *State v. Graham*, 181 Wn.2d 878, 882, 337 P.3d 319 (2014). The purposes of the SRA expressed in RCW 9.94A.010 are: ensure punishment that is proportionate to the seriousness of the offense and the defendant's criminal history, promote respect for the law with just punishment, be commensurate with punishments imposed on others for similar crimes, protect the public, offer an opportunity for the defendant to improve, preserve resources, and reduce the risk of re-offense. Whether a given presumptive sentence is clearly excessive in light of the purposes of the SRA is not a subjective determination of the individual sentencing judge, but rather is an objective inquiry based on the legislature's stated purposes. *State v. Hortman*, 76 Wn. App. 454, 463, 886 P.2d 234 (1994).

A.      Per Image Unit of Prosecution

The legislature has explained that the prevention of sexual exploitation of children is a government objective "of surpassing importance." RCW 9.68A.001. In 2010, the legislature amended former RCW 9.68A.001 (2007) to clarify that first degree offenses for possession of depictions of minors engaged in sexually explicit conduct have a "per depiction or image" unit of prosecution, while second degree offenses have a "per incident" unit of prosecution. RCW 9.68A.001, .070; *State v. Polk*, 187 Wn. App. 380, 391, 348 P.3d 1255 (2015).

The difference between first and second degree possession depends upon the nature of the images. *See* RCW 9.68A.011, .070. Depictions of sexual intercourse, penetration with any object, masturbation, sadomasochistic abuse, or defecation or urination for the purpose of the viewer's sexual stimulation are all depictions triggering possession in the first degree and a per image unit of prosecution. RCW 9.68A.011, .070. The 2010 amendment effectively increased the presumptive sentencing range for a defendant in Vance's position from 12-14 months to 77-102 months.

B.      Denial of Exceptional Sentence Downward in This Case

Vance requested an exceptional sentence below the standard range, but the trial court denied the request and sentenced him to the low end of the range. Vance argues that the trial court erred in not finding that his standard range sentence was "clearly excessive" because it did not adequately consider the factors listed in RCW 9.94A.010. Br. of Appellant at 34-35. Vance concedes that "the trial court seemed to respond to the arguments made by [defense counsel] . . . regarding the [.010 factors]," but he contends that the "sole reason" the court declined to find the sentence excessive was that the legislature had decided to punish this type of sex offense more severely. Br. of Appellant at 35. Essentially, Vance argues that the trial court's deference to the legislature's clear intent regarding the unit of prosecution was improper because the new standard sentence range created by the 2010 amendments results in a sentence that he believes is "clearly excessive" for his crime.

In this case the trial court acknowledged that it had the authority to consider an exceptional sentence downward, and it discussed sentences imposed on others committing similar offenses, the use of state resources, the risk to the community, and other potential

mitigating factors. Ultimately, the court decided to abide by the legislature's amendments establishing the unit of prosecution and impose a sentence at the bottom of the standard range. The court acknowledged that it had considered the factors espoused in the SRA, and although it did not consider Vance a threat to public safety, it declined to impose a sentence inconsistent with the legislature's clear intent to punish more severely crimes involving depictions of minors engaged in sexually explicit activity.

The trial court said that subjectively, it would have preferred to impose a lighter sentence, but "I don't think I can" under *Hortman*'s requirement that the judge objectively apply the legislature's intent. Verbatim Report of Proceedings (VRP) (Vol. 2) at 210; *see Hortman*, 76 Wn. App. at 463. When read in light of the court's entire discussion, this comment refers not to a belief that the court could not impose an exceptional sentence under *any* circumstances, but rather that there was nothing specific or unique about Vance's case that warranted an exceptional sentence. The trial judge discussed the fact that a downward departure would essentially be based on a disagreement with the legislature's determination of the unit of prosecution rather than an individualized determination based on the specific facts of this case.

On balance, the trial court discussed RCW 9.94A.010 factors and decided that they did not warrant downward departure in this case. While the trial court did so in part because it did not want to ignore the legislature's intent regarding unit of prosecution for this crime, consideration of legislative intent is not fatal to the trial court's decision. Consequently, we hold that the trial court adequately considered the RCW 9.94.010 factors and therefore, engaged in the analysis that RCW 9.94A.535(1)(g) required.

C.       Consideration of Mitigating Factors Outside of the Statutory List

Vance also argues that the court failed to consider certain mitigating factors outside of RCW 9.94A.535's nonexclusive list.  First, he argues the court should have considered his post-offense rehabilitation because, although it is not listed as a mitigating factor justifying an exceptional sentence under RCW 9.94A.535(1), the court nevertheless had discretion to consider it when deciding whether to impose a sentence below the standard range.

To determine whether a factor supports departure from the standard sentence range, we apply a two-part test.  *State v. O'Dell*, 183 Wn.2d 680, 690, 358 P.3d 359 (2015), *review denied*, 189 Wn.2d 1007 (2017).  "First, a factor cannot support the imposition of an exceptional sentence if the legislature *necessarily* considered that factor when it established the standard sentencing range."  *Id.*  Second, in order to justify an exceptional sentence, the factor must be "'sufficiently substantial and compelling to distinguish the crime in question from others in the same category.'"  *Id.* (quoting *State v. Ha'mim*, 132 Wn.2d 834, 840, 940 P.2d 633 (1997)).

Even assuming without deciding that post-offense rehabilitation would be an appropriate mitigating factor for the court to consider, there is no indication that the trial court failed to consider it in declining to impose an exceptional sentence.  At sentencing, the court noted that Vance was not a danger to the community and acknowledged defense counsel's arguments regarding Vance's post-offense rehabilitation.

Second, Vance argues that the trial court erred in failing to consider the unavailability of a SSOSA sentence as a mitigating factor justifying an exceptional sentence.  He reasons that the legislature could not have "necessarily considered" the unavailability of SSOSA as a mitigating factor when it established the standard sentence range for defendants in Vance's position

because, at the time the range was established, sex offenders who did not have an established relationship with the victim had been eligible for SSOSA. Br. of Appellant at 44; *see O'Dell*, 183 Wn.2d at 690.

However, Vance makes no argument on the second prong of the relevant test: whether this factor is "'sufficiently substantial and compelling to distinguish the crime in question from others in the same category.'" *Id.* (quoting *Ha'mim*, 132 Wn.2d at 840). The unavailability of a SSOSA sentence for Vance does not distinguish his offense from other offenses for possession of depictions of minors engaged in sexually explicit conduct. In fact, it is a common characteristic of this crime that the defendant does not have an established relationship with the victim. Because this factor does not separate Vance from other defendants in the same category, it does not justify imposing an exceptional sentence downward. Moreover, whether to allow trial courts to use this circumstance as a mitigating factor is a policy question more appropriate for the legislature to address.

We hold the trial court properly considered Vance's request for an exceptional sentence and we therefore affirm the trial court's decision not to depart from the standard range sentence.

IV. CRUEL PUNISHMENT

Finally, Vance argues that the trial court failed to consider his argument that the length of his sentence violates article I, section 14 of the Washington Constitution, which prohibits cruel punishment. He contends his sentence of 77 months constitutes cruel punishment because it is disproportionate to the sentences received in other jurisdictions for similar crimes. We hold that his sentence was not cruel punishment.

A.      Article I, Section 14 Prohibition Against Cruel Punishment

The constitutionality of a statute is a question of law that we review de novo. *State v. Abrams*, 163 Wn.2d 277, 282, 178 P.3d 1021 (2008). We presume that a statute is constitutional; the party challenging the statute bears the burden of proving its unconstitutionality beyond a reasonable doubt. *Id.*

Article I, section 14 prohibits "cruel punishment." *State v. Witherspoon*, 180 Wn.2d 875, 887, 329 P.3d 888 (2014). A defendant's sentence is considered cruel "'when it is grossly disproportionate to the crime for which it is imposed.'" *State v. Moen*, 4 Wn. App. 2d 589, 598, 422 P.3d 930 (2018), *review denied*, 192 Wn.2d 1030 (2019) (quoting *State v. Morin*, 100 Wn. App. 25, 29, 995 P.2d 113 (2000)).

A defendant may challenge the proportionality of his sentence in two different ways. First, he may bring an "as-applied" challenge by arguing his sentence is grossly disproportionate given his particular circumstances. *Moen*, 4 Wn. App. 2d at 598-99. Second, a defendant may assert a categorical challenge by arguing that an entire class of sentences is disproportionate based on "'the nature of the offense'" or the characteristics of a class of offenders. *Id.* (quoting *Graham v. Florida*, 560 U.S. 48, 60-61, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010)).

While Vance argues that we should analyze his claim as an as-applied challenge under *State v. Fain*, 94 Wn.2d 387, 617 P.2d 720 (1980), we disagree. As we pointed out in *Moen*, the *Fain* court addressed an as-applied challenge: whether the defendant's life imprisonment sentence was disproportionate given the circumstances of his particular crime. *Moen*, 4 Wn. App. 2d at 600. Here, Vance does not argue that his specific circumstances make his punishment disproportionate to his crime, but rather that *any* defendant sentenced under the "per image" unit

of prosecution for first degree possession of depictions of a minor engaged in sexually explicit conduct will receive a constitutionally disproportionate sentence. Because Vance "'challenges a sentencing statute as applied to a class of [defendants], rather than solely the constitutionality of his sentence alone, the categorical approach is necessary.'" *Id.* (quoting *State v. Bassett*, 198 Wn. App. 714, 738, 394 P.3d 430 (2017), *aff'd*, 192 Wn.2d 67 (2018)).

We conduct a two-step analysis when reviewing a categorical challenge, considering (1) objective indicia of society's standards to determine whether there is a national consensus against the sentencing practice at issue, and (2) our own understanding of the prohibition of cruel punishment. *Moen*, 4 Wn. App. 2d at 601.

B.       Application of the Categorical Analysis

Our first task is to determine whether there is a national consensus against a "per image" unit of prosecution that results in significant prison sentences for those convicted of possession of certain types of child pornography. Vance argues that federal courts have come to recognize that the relative ease of downloading images from the internet diminishes the value of sentence enhancements based on a per image unit of prosecution, since an offender could almost as easily download thousands of images as mere dozens. As a result, he contends, federal courts have gradually lowered sentences for crimes of possession of child pornography, frequently with minimal or no incarceration. *See, e.g.*, *United States v. Autery*, 555 F.3d 864, 867 (9th Cir. 2009) (affirming sentence of five years of probation with no period of incarceration); *United States v. Stall*, 581 F.3d 276, 277-78 (6th Cir. 2009) (affirming sentence of one day of incarceration with ten years of supervised release).

In particular, Vance points to the discrepancy between his sentence and the sentence he claims he likely would have received had he been charged in federal court rather than in state court. He presents a number of federal cases where defendants in similar situations were sentenced to no more than 36 months, while he received a 77 month sentence and could have received as much as 102 months at the top of the range.

Although Vance presents examples of individual cases from federal courts, he does not provide legislative enactments or state practices regarding sentencing frameworks using a per image unit of prosecution, necessitating an independent examination of sentencing practices from around the country to determine whether a consensus exists. The United States Federal Sentencing Guidelines manual includes a sentencing enhancement based on the number of images possessed by the defendant. *See* U.S. FEDERAL SENTENCING GUIDELINES manual § 2G2.2(b)(7) (2018). The guidelines specify an enhancement of two levels if the offense involved between 10 and 150 images. U.S. FEDERAL SENTENCING GUIDELINES manual § 2G2.2(b)(7)(A). For a defendant in Vance's situation, this would result in a prison sentence of 33 to 41 months. *See* U.S. FEDERAL SENTENCING GUIDELINES manual, ch. 5, part A.

Other states also provide for comparable sentences for possession of multiple images. California's child pornography statute prescribes a punishment of imprisonment for up to one year for possession of any image, with the term of confinement increasing up to five years if the number of images exceeds 600, and 10 or more of those images involve a prepubescent minor. CAL. PENAL CODE § 311.11(a)-(c)(1). New York defines possession of child pornography as possession of "any performance which includes sexual conduct" by a child and classifies it as a

26

class E felony, which carries a maximum term of four years in prison. N.Y. PENAL LAW §§ 70.00(2)(e), 263.16.

Illinois classifies possession of child pornography as a class 3 felony, which carries a sentence between two and five years of imprisonment. 720 ILCS 5/11-20.1(a)(6), (c); 730 ILCS 5/5-4.5-40(a). Similar to Washington, Illinois specifies that the possession of each individual photograph of child pornography "constitutes a single and separate violation." 720 ILCS 5/11-20.1(a-5). Also similar to Washington, the Illinois legislature specifically amended the statute to specify a per image unit of prosecution after an appellate court declined to construe the former statute's use of the term "any" as meaning one count per photograph. *See People v. McSwain*, 964 N.E.2d 1174, 1187-90 (Ill. App. Ct. 2012); 2013 ILL. LEGIS. SERV. P.A. 98-437 (H.B. 2647) (West); *State v. Sutherby*, 165 Wn.2d 870, 882, 204 P.3d 916 (2009). Indeed Illinois's sentencing framework appears to be even more severe than Washington's, as Illinois mandates that judges impose consecutive sentences for defendants with certain child pornography convictions, including some forms of possession. 730 ILCS 5/5-8-4(d)(2.5).

The Pennsylvania Supreme Court has reasoned that its legislature's use of the term "any" in its definition of possession of child pornography "suggests a lack of restriction or limitation" and concluded that "each photograph or computer depiction constitutes a distinct occurrence of offensive conduct." *Commonwealth v. Davidson*, 595 Pa. 1, 35-36, 938 A.2d 198 (2007). The *Davidson* court concluded that the plain language of the statute made clear that the legislature intended for each image of child pornography possessed by an individual to be a separate, independent crime. *Id.* at 36. In rejecting the defendant's double jeopardy challenge based on his 28 convictions for possession of child pornography, the court noted that "a significant

27

majority" of other jurisdictions have similarly found that possession of each image of child pornography constitutes a separate offense and that this is a permissible unit of prosecution. *Id.* at 37 (citing *United States v. Esch*, 832 F.2d 531, 541-42 (10th Cir. 1987); *People v. Renander*, 151 P.3d 657, 660 (Colo. App. 2006); *Fink v. State*, 817 A.2d 781, 788 (Del. 2003); *State v. Farnham*, 752 So.2d 12, 14-15 (Fla. Dist. Ct. App. 2000)).

This review of other state practices does not reveal a clear consensus against a per image unit of prosecution for child pornography or a clear consensus that the length of Vance's sentence is unusually cruel. Many jurisdictions employ some form of sentence enhancement based on the number of images possessed, and Illinois in particular has a statutory provision nearly equivalent to RCW 9.68A.001 specifying a per image unit of prosecution for possession of child pornography. Although the high courts of other jurisdictions have typically addressed this issue in the context of double jeopardy, rather than cruel punishment, the fact remains that those jurisdictions have interpreted their statutory sentencing schemes to permit per image units of prosecution. And although some federal courts have shifted toward imposing more lenient sentences, this does not establish a national consensus against the practice chosen by Washington's legislature.

There being no apparent national consensus against a per image unit of prosecution, Vance's cruel punishment claim fails under the first prong of the categorical approach. As a result, we need not address the second prong.

We hold that Vance's sentence is not cruel punishment.

CONCLUSION

We affirm Vance's convictions and sentence. The trial court properly applied the silver platter doctrine, the 2004 amendment to the SSOSA statute did not violate equal protection, the trial court properly declined to impose an exceptional sentence downward, and Vance's sentence is not cruel punishment under article I, section 14.

Glasgow, J.

We concur:

Worswick, J.

Maxa, C.J.

29